UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**DENIS ANTONIO VILLALTA ARGUETA**            **PETITIONER**

**V.**            **CIVIL ACTION NO. 3:21cv209-NBB-JMV**

**BESSY NORIBETH HERNANDEZ LEMUS**            **RESPONDENT**

**REPORT AND RECOMMENDATION**

This matter is before the undersigned following an evidentiary hearing[1] and post-hearing briefing for a report and recommendation on the Petitioner's complaint filed pursuant to the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §9003 (2015) (formerly 42 U.S.C. §11603 (1995)), and "The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980." ("The Convention"). The issue before the Court is whether jurisdictionally the minor child of the parties should be returned to Honduras under the Hague Convention or should remain in the United States for purposes of determining custody. The issue of custody would be determined by either a state court here in the United States or a court of proper jurisdiction in Honduras.

I.     <u>The Hague Convention</u>

The Hague Convention is an international treaty to which both the United States and Honduras are signatories. *See Sanchez v. R.G.L*, 761 F.3d 495, 500 (5th Cir. 2014). The Hague Convention was adopted in 1980 in response to the emerging problem of international child abductions perpetrated by parents, grandparents, and close family members. *See Mozes*

---

[1] At the hearing testimony was taken of Petitioner, who is the minor child's father ("Father"), Bessy Noribeth Hernandez Lemus ("Mother"), Mother's mother, Ms. Reina Elizabeth Lemus Lopez ("Maternal Grandmother"), Mother's husband, Mr. Henry Antonio Aguirre ("Henry"), the parties' close friend, Ms. Bessy Interiano Lopez ("Bessy")].

1

*v. Mozes*, 239 F.3d 1067, 1069-70 (9th Cir. 2001). The Hague Convention sought to remedy the situation where such abductors unilaterally remove a child from his or her habitual residence seeking a country whose courts are friendlier to them for deciding custodial disputes. *See Abbott v. Abbott*, 560 U.S. 1, 20 (2010).

The Hague Convention's stated purpose is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1. The United States is a Contracting State and Congress implemented its provisions through the International Child Abduction Remedies Act ("ICARA"), 102 Stat. 437, 42 U.S.C. §§ 11601 et seq. ICARA establishes procedures for applying the Hague Convention in the courts of the United States, specifically assigning burdens of proof for proving a case for the return of a child and for establishing affirmative defenses to return. See 42 U.S.C. § 11603. In addition, Congress made clear that the provisions in ICARA "are in addition to and not in lieu of" the Hague Convention. *Id.* at § 11601(b)(2).

Under ICARA, anyone seeking the return of a child allegedly wrongfully removed to or retained in the United States may commence a civil action in any court that has jurisdiction over the action and the place where the child is located. Id. § 11603(b). Once an ICARA action is filed, the "court in which [the] action is brought . . . shall decide the case in accordance with the Convention." *Id.* § 11603(d). Though the Hague Convention is silent with regard to burdens and standards of proof, ICARA provides that the petitioner seeking the return of the child has the burden of proving by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." *Id.* § 11603(e)(1)(A). This is sometimes referred to as the "*prima facia* case" and is comprised of establishing, by a preponderance of the

2

evidence ("POE"), that: (a) the respondent has retained the child somewhere other than the child's habitual residence; (b) respondent's retention of the child violated Petitioner's custody rights in the country where the child habitually resided; and (c) at the time of Respondent's retention of the child, Petitioner was exercising his custody rights and would still be exercising his custody rights but for Respondent's retention of the child in the United States. *See Alanis v. Reyes*, 230 F. Supp. 3d 535, 539 (N.D. Miss. 2017).

If a *prima facia* case is established, the respondent then has the burden of proving that one of the affirmative defenses listed in Articles 12, 13, or 20 applies. *See* § 11603(e)(2). The standard of proof for these defenses is either by a preponderance of the evidence or by clear and convincing evidence. *See* § 11603 (e)(2)(A)(B).[2]

II.    <u>The Petition</u>

On September 23, 2021, Petitioner filed his Verified Petition for Return of Child to Honduras and for Immediate Issuance of Show Cause Order pursuant to The Hague Convention and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001 *et seq.* The petition, which was served on Respondent on October 14, 2021, charges that the respondent illegally and wrongfully removed to/retained in the United States the couple's minor child born December 19, 2015. The petition alleges that the father, the mother, and the child are all citizens of Honduras. The child was born in Maryland, while the parties were visiting the United States. Although they believed themselves to be married at the time, they apparently later learned their marriage was not legal due

---

[2] Even where an affirmative defense is established, the court may still order the return of the child pursuant to Article 18 of the Convention, which states that "[t]he provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time." Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10494 (1986) ("Public Notice 957"), note 6, at 10509; *see also Antunez-Fernandes v. Connors-Fernandes*, 259 F. Supp. 2d 800 (N.D. Iowa 2003); *Moreno v. Martin*, No. 08-22432-CIV, 2008 WL 4716958, at *24 (S.D. Fla. Oct. 23, 2008); *Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1347 (S.D. Fla. 2002). As explained hereafter, because it is my report that no applicable affirmative defense has been established, it is unnecessary to address this exception.

3

to a technicality regarding the filing of the marriage license. Though the parties were visiting the United States when the child was born, they returned to Honduras thereafter and lived together as a family there until August 29, 2020, when, as discussed in greater detail below, mother and child left Honduras for the United States to stay with a family friend as they had done on prior occasions. They had a round trip return ticket to Honduras for Sept. 26, 2020, but they did not return. Instead in or around 2020 to 2021, Mother met and later married another man and remains today with the child in the United States.

### III. The *Prima Facie* Case and the Affirmative Defenses

The parties have stipulated in the instant case that the Father has established a prima facia case. As such, there remains for decision only the issue of whether the mother has established, by the requisite degree of proof, one of the affirmative defenses raised by her, and if she has, whether the court should nevertheless exercise its discretion to order the child returned to Honduras.

The Mother advances the following affirmative defenses under Articles 12 and/or 13 of the Convention and 22 U.S.C. §9003(e)(2): (a) that Father had consented and/or acquiesced to the child remaining in the United States; (b) that the child would be subjected to grave risk of physical or psychological harm if he were returned to Honduras, with the basis of this claim being domestic violence that Father had allegedly perpetrated against Mother, or that the child should not be returned to Honduras because he would be placed in an "intolerable situation" due to gang violence and drug trafficking in La Pita, Honduras, where the child had lived with both of his parents; and (c) that more than one year has passed since the date of wrongful removal, and that the child has become well settled in the United States and should not be returned.

4

IV.        Hearing Testimony

Prior to Mother removing the child from Honduras on August 29, 2020, for travel pursuant to a round trip ticket to the United States with a return date of September 26, 2020, the child was enrolled in school in Honduras and attended the Happy Days School. *See* Trial Exs. 6 (enrollment) and 7 (photos at school). Mother testified that the child had friends at his school in Honduras and that prior to her removing the child from Honduras, the child spent a great amount of time with Maternal Grandmother and frequently spent time with the child's aunts, uncles, and cousins. Mother testified that her sister and the child's cousins lived minutes away from them in Honduras, and Mother's other sibling lived about 45 minutes away from them. Father gave undisputed testimony that the child attended church in Honduras with Mother and Father. Mother testified that Father took the child to visit Father's family in another part Honduras, and that the child spent time with his cousins on Father's side of the family, which numbered more than ten. Both parties testified that they had family celebrations in Honduras with the child. Mother admitted that the child had a dog in Honduras, and Father still has the dog.

Prior to the August 29, 2020, trip to the United States, Father and Mother had a history of visiting the States. Mother testified that she previously traveled here on at least three occasions since the child's birth to visit Bessy Interiano Lopez ("Bessy"), who had been friends with Mother since 2009 and with Father since 2012. Mother admitted that she previously worked for Bessy during at least one of her prior visits to stay with Bessy in the United States, and Bessy testified that Mother previously worked for her every time she came to visit the United States. When Mother visited Bessy in the United States, she would always buy a round-trip ticket, according to the testimony of Maternal Grandmother. Bessy testified that the parties would always stay with her and would stay for one to two months.

5

Mother testified that the plane ticket she used to come to the United States in August 2020 was one that Bessy gave Mother as a birthday present in January 2020. The flight was originally scheduled for June 2020. Mother was unable to use the plane ticket in June 2020 because the airports had closed due to Covid restrictions, so Mother rescheduled the flight for August 29, 2020. Maternal Grandmother testified that Mother acted like she was going to be coming back to Honduras prior to her leaving Honduras on August 29, 2020. It is also undisputed that Mother and the child had a round-trip plane ticket to return to Honduras from America, and that the "authorization to travel" document that Father signed prior to Mother and the child leaving Honduras stated that Mother and the child would return to Honduras on September 26, 2020, when Father testified Mother and child were supposed to return on their round-trip flight back to Honduras. Father's undisputed testimony was that he could not travel with Mother and the child to the United States in August 2020 because his visa had expired. After mother and child did not return, Father renewed his visa in December 2020, and traveled to the United States in early February 2021.

When Mother left Honduras on August 29, 2020, Mother admitted (and Maternal Grandmother corroborated) that Mother left behind most of her clothes, most of the child's clothes, and the child's toys (all but one, Bessy testified), at the parties' shared home that is titled in Mother's name in Honduras. Mother testified that she planned to buy herself and the child a new wardrobe of clothing when they got to America; however, she further testified that she only took $200 with her on the trip. Maternal Grandmother testified that there was no "going away" party for Mother and the child. Maternal Grandmother testified that Father and Mother agreed prior to August 29, 2020, that the child would remain in the United States, but Maternal Grandmother also

6

said that she did not know what the parties discussed between them prior to Mother leaving on August 29, 2020.

Bessy testified that Mother and Father did not end their relationship until December 2020, while Mother and child were still staying with Bessy. Maternal Grandmother testified that Father removed his belongings, furniture, cooking utensils, and other items, from the parties' shared home in Honduras in December 2020, supporting this date of the relationship ending. Mother owned the home in which she, Father, and the child resided in Honduras prior to her visit to the United States, and Mother still owned that home in Honduras as of the date of the hearing in this matter. Mother testified that she never took any affirmative action to close her bank account that she had in Honduras when she left in August 2020, and that after she arrived in the United States on August 29, 2020, she never took any steps to begin the immigration process to remain legally in the United States.

Mother testified that for the first six months that she and the child were in the United States, the child had consistent contact with Father three times per week. It is Mother's testimony that things changed when she started her relationship with her current husband, Henry, in late 2020 to early 2021. Before Mother's relationship with Henry became serious, Mother and the child were living with Bessy. Bessy testified that Mother did not indicate that she had intentions of staying in the United States until Mother met Henry, *after* Mother arrived in the United States. Bessy testified that she had planned to drive Mother to Atlanta, Georgia for Mother's return flight to Honduras on September 26, 2020.

The parties' son turned six years of age on December 19, 2021, and began kindergarten in Mississippi in August 2021. When Mother enrolled the child in kindergarten, she did not list Father's name on any enrollment documents for the child's school, nor did she provide the school

7

with a phone number for Father. *See* Trial Ex. 22. Mother admitted that she did, however, provide the school with Henry's contact information. *See* Trial Ex. 22. Mother testified that the parties' son is now calling Henry "daddy." When the child began kindergarten, he was not proficient in reading, and he was unable to speak English. *See* Trial Ex. 22.

Both Father and Maternal Grandmother testified that Father wanted to bring Maternal Grandmother to the United States in January 2021 as a birthday surprise for Mother; however, this trip did not occur because Mother did not want Father to bring Maternal Grandmother to the United States. Father traveled alone to the United States on either February 5 or 6, 2021 . Mother testified that Father was attempting to salvage his relationship with Mother. Mother testified that when Father was in the United States, Father asked Mother to please give him all of the child's documents to be able to return him to Honduras. Mother also testified that Father threatened to take the child away to Honduras, and to get Mother deported. Mother testified that Father told her to give him the child's passport or he would call the cops on Mother so that she would be deported because the child's visa was set to expire. Mother stated that once she made it clear to Father that she and the child would not be returning to Honduras, Bessy and Father sat Mother down and asked her to agree to return the child to Honduras with Father.

Although the minor child held dual citizenship, his United States passport only reflects Mother's last name, and his United States birth certificate does not identify Father as the legal father of the minor child. *See* Trial Exs. 24, 25, and 27. Thus, Father testified he had no legally identifiable right to travel with the child using solely the child's passport.

Mother testified that she agreed in February 2021 that the child could return to Honduras with Father, and she paid for an expedited renewal passport for the child. Mother then testified that she knew she had to provide a signed document to Father giving him authorization to travel;

8

however, she testified that she never gave him that document because he never asked for it. Mother left the child with Father at Bessy's home on February 24, 2021, for Father to take the child back to Honduras, and Mother testified that she had made the decision that the parties' son would go back to Honduras, and that she wanted to enjoy the last days of Father's visit peacefully.

The same day that she agreed that their son would return to Honduras with Father, Mother moved out of Bessy's house and went to live with Henry at his apartment in Memphis, Tennessee, a man who she testified that she had just begun dating in January 2021. Mother testified that she did not check on the child after that day. Father and the child remained at Bessy's for over two weeks, and Mother testified that she did not hear from Father or Bessy until Bessy called her on March 11, 2021. Father, on the other hand, testified that Mother refused to respond to his telephone calls and text messages after February 24, 2021.

Around that time, Father testified that he had contacted his attorney in Honduras who advised Father to leave the child in the United States and further advised Father that he needed to return to Honduras to file a court action. On March 11, 2021, Bessy testified that Father said he would leave the child in the United States with Mother and that Father wanted to do things properly through a court action. On March 11, 2021, Bessy told Mother to come pick up the child because Father had returned to Honduras and the child remained at Bessy's house. Notably, Father filed his International Restitution Request with the Central Authority of the Republic of Honduras on March 16, 2021, three days after he returned to Honduras. This is consistent with the advice of his Honduran counsel.

While Mother alleges that Father consented or acquiesced to the minor child moving to or remaining in the United States, Mother testified that Father continuously requested that his son be returned to Honduras once he became aware that she was not returning to Honduras with the minor

9

child. Text messages admitted into evidence demonstrate Father's interest in having his son returned to Honduras. *See* Trial Ex. 14, 15, and 16.

Mother testified that Father had put his hands on her during their relationship before coming to the United States. Maternal Grandmother testified that on one occasion, she heard the parties arguing through the wall and Father took off in his vehicle. Maternal Grandmother went next door, Mother was crying, and Maternal Grandmother saw a bruise on Mother's arm. Mother said that Father had tightly grabbed her shoulder during an argument. Mother testified that she did not notice the bruise until Maternal Grandmother pointed it out to Mother. Neither Mother nor Maternal Grandmother ever called the police on Father in Honduras. Bessy, Mother's admittedly close friend until January 2021, testified that Mother never said to Bessy that Father was violent or abusive toward Mother, that he gave Mother bruises, or that Father was a danger to the child. Mother also testified Father had never abused the child. Mother testified that the parties' biggest arguments, when they lived in Honduras, centered around Father traveling to his family property for extended periods of time and spending time away from her. Also, when Mother filed her Petition for Custody, Support, and Visitation in DeSoto County, Mississippi, on October 26, 2021, Mother did not include any abuse allegations in her petition, and she requested that Father be given visitation with the child. *See* Trial Ex. 21.

Although Mother's new husband, Henry, testified that Father made death threats to Mother, Mother denied that Father ever made any death threats to her or to Henry. Henry, on the other hand, admitted that he threatened to have Father killed and testified that he reached out to someone in Honduras to ask that Father be killed. *See* Trial Ex. 16. Henry also admitted that he went to Bessy's home on February 6, 2021, with the intention of confronting Father. Henry testified that he heard Father say to Mother, "Give me my son's papers or you will see what happens," and

heard Father threaten to have Mother deported. Henry claimed that Father was stalking them but also testified that he could not say if Father followed them or not. Henry testified that he and Mother would not allow Father to talk to the child because Father would ask the child questions such as "who is taking care of you?"

Mother and Maternal Grandmother testified about gang violence and drugs being sold in their neighborhood in Honduras, but there was no testimony that Mother, Father, Maternal Grandmother, or the child had ever been a specific target of any violence or crime. Maternal Grandmother continues to live next door to Mother's home in Honduras where the parties lived together. Mother testified that she agreed for Father to take the child back to Honduras with him in February 2021. Father testified that he no longer lives in the same town where Mother's residence is but lives approximately three-and-a half to four-and-a-half hours away by car. There was no testimony put forth by Mother or her witnesses about any gang violence or danger in the community where Father currently lives in Honduras.

Regarding how the child has adjusted to life in the United States, Mother testified that the child has done well in school in Mississippi, but she also testified that he had done well at his school in Honduras. Despite this testimony, the school records from Shadow Oaks Elementary indicate the minor child was not proficient in reading. *See* Trial Ex. 22 at 41. Mother failed to introduce any recent grade reports for the child. Mother and Henry testified that she and the child still speak Spanish in the home and Mother testified at trial in Spanish. Mother and Henry both testified that the child was very excited when Maternal Grandmother, still a Honduran resident, would come to visit them in Mississippi. Mother's proof as to the child being 'well-settled' in Mississippi consisted of photographs of the child with Henry's family members. *See* Trial Ex. 28. There were no photographs introduced of any friends that their child has made in Mississippi nor

11

evidence of his involvement in any extra-curricular activities. Mother testified that since she came to the United States on August 29, 2020, she has lived in three different residences and has had four different jobs. Henry testified that he and Mother have tried to get the child very involved with Henry's family, and that the child spends five hours a day, six days a week, with Henry's family.

    V.    <u>The First Affirmative Defense: Issue of Consent and/or Acquiescence</u>

Under Article 13(a) of the Convention, the court is not bound to return a child if the respondent establishes by a preponderance of the evidence that the petitioner consented to or subsequently acquiesced in the removal or retention. CONVENTION, art. 13; 22 U.S.C. § 9003. The "consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Larbie v. Larbie*, 690 F.3d 295, 308-09 (5th Cir. 2012). The consent defense pertains to the left-behind parent's conduct prior to the contested removal or retention. *See id.* at 308. In considering the consent defense, the court must consider "what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country." *Id.* at 308–09. This inquiry includes an examination of the nature and scope of the petitioner's consent, and any conditions or limitations. *See id.*

On the other hand, the acquiescence defense concerns whether the petitioner subsequently agreed to or subsequently accepted the removal or retention. *See id.* at 308. "Consent applies to pre-removal/retention activity and may be shown by less 'formal' types of evidence, whereas acquiescence applies to post-removal/retention activity and generally requires more 'formal' evidence such as a custody order or other "'convincing written renunciation of rights.'" *Id.* at 309 n.14. "The formal renunciation of rights has been described more specifically as 'an act or

12

statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time.'" *Munoz v. Ramirez*, 923 F. Supp .2d 931, 957 (W.D. Tex. 2013), citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996).

As applied to the facts described above and testified to at trial, it is the report and recommendation of the undersigned that Mother has not established by the necessary burden of proof ("POE") that Father consented or acquiesced to permanent removal of his minor son from Honduras. On the contrary, the credible proof was that Father did not so consent or acquiesce. It was Father's understanding that Mother and the child were going to visit the United States for about a month, as they had done many times before. Father did not join them because his own visa was not current at that time. Father did not suspect that Mother was planning on staying permanently, as Mother had acquired a round-trip ticket and left most of her and the child's belongings at her home in Honduras when she and the child left for the trip. Even Maternal Grandmother testified that Mother was acting as if she was returning to Honduras when she left on August 29, 2020. Notably, in addition to leaving virtually all of their personal belongings in Honduras, Mother took only $200 in cash with her when they left for her friend's house in the United States, and she left her bank account open in Honduras.

Consistent therewith, when Mother and the child did not return to Honduras on September 26, 2020, Father began to ask Mother what was happening, and Mother made excuses. Father traveled to the United States shortly after his visa was renewed to try and talk Mother into coming back to Honduras with the child. When Father left the United States in March 2021, Father could not take the minor child with him without Mother's written consent and Father was advised by his Honduran counsel to return to Honduras to use the proper legal channels there to have the minor

13

child returned to him in Honduras. When Father returned to Honduras, he, virtually immediately, sought assistance with the court system there to have the child returned to Honduras.

VI. <u>No Grave Risk of Harm</u>

The undersigned also reports that Mother failed to prove by clear and convincing evidence that the parties' child would be subject to a grave risk of physical or psychological harm if the child were returned to Honduras. Courts have held that "[n]ot any harm will do nor may the level of risk of harm be low," and "when determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention." *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000). The "grave risk" exception is a narrowly drawn one, and it is "not a license for a court in the abducted-to country to speculate on whether the child would be happiest." *Friedrich*, 78 F.3d at 1068. Courts have defined "grave risk" as serious abuse, neglect, or "extraordinary emotional dependence." *Id.* at 1060.

The *Walsh* court did find that a grave risk of harm to the children existed – but the facts in *Walsh* contrast starkly to the facts here. *Walsh*, 221 F.3d at 204. In *Walsh*, Mrs. Walsh fled to the United States with her children from Ireland because of the severe abuse to which Mr. Walsh had subjected her and her children. Mr. Walsh's behavior consisted of the following: he brutally beat Mrs. Walsh while she was seven-months pregnant, leaving Mrs. Walsh with bruises, a swollen face, and a broken tooth; he burglarized a friend's house in a rage and threatened to kill the friend, for which he was criminally indicted; he punched Mrs. Walsh on her ear so hard that it bled in front of their young daughter; he broke into and ransacked the marital residence twice after Mrs. Walsh had been granted a protective order; Mr. Walsh spit in his young daughter's face and called her stupid; and Mr. Walsh would lock the children in their rooms when he would get a headache. The abuse suffered by the children was severe enough that the parties' daughter was eventually

diagnosed with post-traumatic stress disorder. *See id.* The *Walsh* court found that the facts of the case, "including the father's fight after indictment for threatening to kill another person in a separate case and a documented history of violence and disregard for court orders going well beyond what one usually encounters even in bitter divorce and custody contexts," were sufficient to prove that the children would be subject to a grave risk of harm if returned to Ireland. *Id.* at 222.

By contrast, in the instant case, Mother's assertions that Father was abusive toward her, including bruising her shoulder by grabbing it on one occasion and pushing her on to the bed, and pulling her hair on another (while she was staying with Bessy), simply do not rise to the level of a "grave risk of harm," a narrow exception to the mandatory return rule contemplated by the Convention.

VII.    No "Intolerable Situation"

It is my further report that Mother also failed to prove that returning the child to Honduras would place the child in an "intolerable situation." The Second Circuit states that an "intolerable situation was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than the requested State. An example of an 'intolerable situation' is one in which a custodial parent sexually abuses a child." *Blondin v. Dubois*, 238 F.3d 153, 162 (2nd Cir. 2001). The circumstances here do not rise to the level of an "intolerable situation" as illustrated by the following testimony: (a) Maternal Grandmother testified that she lived next door to Mother's home where the parties lived in Honduras; (b) Maternal Grandmother still lives next door to Mother's Honduran home; (c) When Father visited the United States in 2021, Mother testified that she eventually agreed for Father to take the child back to Honduras with him; (d) Father testified that if the child were ordered to return to Honduras, Father would have the child with him at his family's house, which is located three-and-a-half to

15

four-and-a-half hours away from Mother's house; and (e) there was no testimony or proof that the area where Father's family house stands is a dangerous area.

Mother and Maternal Grandmother gave limited and vague testimony that the area of Honduras in which the parties and the child were living was dangerous but, in any event, their testimony does not meet the level of "intolerable situation" as contemplated by the Convention. Mother failed to meet her burden to prove this affirmative defense.

VIII. Mother Cannot Avail Herself of the Well-Settled Defense; Alternatively, the Mother has Not Established by POE that Child has Become Well-Settled

Article 12 requires mandatory return of a child who has been removed from their habitual residence if the "date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is" is less than a year after the "wrongful removal or retention" of the child in the Contracting State. In other words, to pursue a well settled defense, Mother must establish that the instant proceedings were begun one year or more after the child was wrongfully removed or retained. In the instant case, Father initiated these proceedings on September 23, 2021, and since, as discussed above, Father reasonably believed, at least until September 26, 2020, that Mother and the child would be returning to Honduras via their round-trip ticket for doing so, the child had not been wrongfully retained in the United States for over a year when Father initiated these proceedings. It is my report that this fact alone causes this defense to fail as a matter of law.

Moreover, Mother has not proven that the child was well-settled in his new environment based on the testimony of the parties and their witnesses. Mother must be able to prove with "substantial evidence of the child's significant connections" that the child has become well-settled in the United States. *In re Koc*, 181 F. Supp. 2d 136, 152 (E.D.N.Y. 2001). The *Koc* opinion further states, "[a]though 'settled' is not a legal term of art, nor does the Convention or ICARA define

16

'settled,' the reference to 'significant connections' reflects the objective of the Convention to have children promptly returned and to have custody matters decided in the state with the strongest interest in the child's care, protection, training and personal relationships." *Id.*

The court must consider all relevant factors relating to this doctrine: "(1) the child's age; (2) the stability and duration of the child's residency in the new environment; (3) whether the child attends school or daycare consistently; (4) whether the child has friends and relatives in the area; (5) the child's participation in the community or extracurricular activities; (6) the respondent's employment and financial stability; and (7) the immigration status of the respondent and child." *Hernandez v. Garcia-Pena*, 820 F. 3d 782, at 787-88 (5th Cir. 2016).

The undersigned finds the following facts weigh against the child being found "well-settled" in the United States:

1. The child is only six years old.
2. Mother testified she and the child have lived in three different places since they came to the United States on August 29, 2020: first they lived with Bessy in Olive Branch, Mississippi, then they moved in with Henry in an apartment in Memphis, Tennessee, then Mother, the child, and Henry moved to Horn Lake, Mississippi.
3. Mother testified that she has had four different jobs since August 29, 2020.
4. Mother testified that the child's first language is Spanish.
5. Mother and Henry testified that Spanish is the primary language spoken at their house.
6. The minor child was found to be "not proficient" in his aptitude tests for entry into kindergarten.
7. Mother and Father testified that all of Father's family lives in Honduras.
8. Mother and Henry testified that all of Mother's family lives in Honduras.

9. Father testified that the child was enrolled in the Happy Days school in Honduras, where he had made friends.

10. Father testified that the child went to church in Honduras.

11. Father testified that the child had a dog in Honduras named Doggo.

12. Father testified that the child had many family members in Honduras, both his and Mother's.

13. Father testified that he and the child would live near Father's family in Honduras.

14. Henry testified that the child spends five hours a day, six times a week with Henry's family.

Finally, the fact that the parties' child is so young makes it less likely that he has become well-settled in the United States. In *Hernandez v. Garcia-Pena*, 820 F. 3d 782, at 783-4 (5th Cir. 2016), in a case of first impression for the Fifth Circuit regarding the "well-settled doctrine," a mother removed her six-year-old child from Honduras to the United States, and the father filed a petition under the Convention. The mother argued that the child was well-settled in the United States, but the court held that the six-year-old was "a very young child not able to form the same level of attachments and connections to a new environment as an older child." *Id.* at 789. The child in this case is the same age as the child in *Hernandez*.

In this case, the minor child had connections to family, pets, his school, and his church in Honduras. Here, Mother did not forth any proof that the parties' child has made friends in the United States, that the child's school proficiency scores have improved since his initial intake tests, that the child is involved in extracurricular activities, or that the child ever had a doctor in the United States. Conversely, Father testified that the child had friends in Honduras, obtained medical

care in Honduras, was involved in church, and enrolled in school. As such, it is my report that this defense has not been established.

IX. <u>Conclusion</u>

In summary, I report and recommend that the petition be **GRANTED,** but as to the Father's allegation that should he prevail in this matter, this court should award all such expenditures incurred by him, as required by 22 U.S.C. § 9007 and Miss. Code Ann. § 93-27-312, it is my report that the same is premature, and that should my report be adopted, the matter of an award of expenditures be dealt with at that time.

The parties are referred to L. U. Civ. R. 72(a)(3) for the applicable procedure in the event any party desires to file objections to the findings and recommendations herein contained. The parties are warned that any such objections are required to be in writing and must be filed within fourteen (14) days of this date. Failure to timely file written objections to the proposed findings conclusions and recommendations contained in this report will bar an aggrieved party, except upon grounds of plain error, from attacking on appeal unobjected-to proposed factual findings and legal conclusions accepted by the district court. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Respectfully submitted, this the 9th day of March, 2022.

<u>/s/ Jane M. Virden</u>
**UNITED STATES MAGISTRATE JUDGE**